THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| VIDANGEL LLC,<br><br>     Plaintiff and Counterclaim Defendant,<br><br>v.<br><br>CLEARPLAY, INC.; and DOES 1 through 10,<br><br>     Defendants and Counterclaim Plaintiff. | **MEMORANDUM DECISION AND ORDER ON [282][285] CLAIM CONSTRUCTION**<br><br>Case No. 2:14-cv-00160-DBB-CMR<br><br>District Judge David Barlow |
| CLEARPLAY, INC.,<br><br>     Counterclaim Plaintiff<br><br>v.<br><br>JEFFREY HARMON and NEAL HARMON, and DOES 1 through 10,<br><br>     Counterclaim Defendants. | |

Defendant ClearPlay, Inc. ("ClearPlay") accuses Plaintiff VidAngel LLC ("VidAngel") of infringing its patents. The parties filed cross motions for claim construction.[1] On December 8, 2023, the court held a *Markman* hearing to further develop the record on claim construction. This Memorandum Decision and Order construes the disputed terms.

---

[1] ClearPlay, Inc.'s Cross Motion for Claim-Construction ("ClearPlay Mot."), ECF No. 282; VidAngel, LLC, Jeffrey Harmon, and Neal Harmon's Cross-Motions for Claim Construction ("VidAngel Mot."), ECF No. 285; *see also* VidAngel, LLC, Jeffrey Harmon, and Neal Harmon's responsive Claim Construction Brief ("VidAngel Resp."), ECF No. 297; ClearPlay, Inc.'s Responsive Claim Construction Brief ("ClearPlay Resp."), ECF No. 299.

# BACKGROUND

VidAngel "provides products and services related to a cloud-based software solution for filtering streaming video."[2] ClearPlay likewise is in the business of content filtering.[3] In essence, both parties provide a solution for the problem of potentially objectionable content—for example, nudity, blood, and curse words—appearing in movies, television shows, and other multimedia. From 2005 to 2014, ClearPlay obtained several patents for its filtering technology,[4] which are now the subject of this litigation. In 2014 VidAngel commenced this suit, after receiving a demand letter from ClearPlay that asserted that VidAngel was infringing ClearPlay's patents.[5] ClearPlay then counterclaimed that VidAngel was infringing its patents.[6]

Four patents are presently at issue[7]: U.S. Patent Nos. 6,889,383 (the "'383 Patent"),[8] 7,577,970 (the "'970 Patent"),[9] 7,526,784 (the "'784 Patent"),[10] and 8,819,263 (the "'263 Patent").[11] The '970 Patent "describes a mechanism that compares the play position in the multimedia content against navigation objects," while the '383, '784, and '263 Patents "cover systems and processes for retrieving or delivering navigation objects from a 'server system.'"[12]

The parties identify ten disputed terms: (1) "navigation object"; (2) "filtering action"; (3) "skip[ping]"; (4) "filter[ing]" when used as a verb; (5) "activating the filtering action(s)"; (6)

---

[2] Pl.'s Complaint for Declaratory Judgment of Patent Non-Infringement and Invalidity ¶ 3 ("Compl."), ECF No. 1.
[3] ClearPlay Mot. 1.
[4] *See infra* notes 8–11 and accompanying text.
[5] Compl. ¶ 21–22; Def.'s Third Am. Answer to Complaint and Counterclaims ("Defs.' Counterclaims") ¶ 23–24, ECF. No. 232.
[6] Def.'s Counterclaims ¶¶ 11–52.
[7] ClearPlay Mot. 2; VidAngel Mot. 1.
[8] U.S. Patent No. 6,889,383 (filed May 3, 2005).
[9] U.S. Patent No. 7,577,970 (filed Aug. 18, 2009).
[10] U.S. Patent No. 7,526,784 (filed Apr. 28, 2009).
[11] U.S. Patent No. 8,819,263 (filed Aug. 26, 2014).
[12] ClearPlay Mot. 3.

"position code" (7) "consumer [computer] system"; (8) "decod[e/er/ing]"; (9) "disable[e/ed/ing]"; and (10) "representation."

The first two claims of the '970 Patent are provided as examples, with disputed terms italicized:

The invention claimed is:

1. In a computerized system for enabling a consumer to *filter* multimedia content that is comprised of video content, audio content, or both, and wherein a *consumer computer system* includes a processor, a memory, a *decoder*, and an output device for playing the multimedia content, a method for assisting the consumer to automatically identify portions of the multimedia content that are to be *filtered* and to thereafter automatically *filter* the identified portions, the method comprising:

loading a plurality of *navigation objects* into the memory of the *consumer computer system*, each of which defines a portion of the multimedia content that is to be *filtered* by defining a start position and a duration from the start position and a *filtering action* to be performed on the portion of the multimedia content defined by the start and the duration from the start position for that portion;

updating a *position code* in association with *decoding* the multimedia content on the *consumer computer system*;

comparing the *position code* with a particular *navigation object* to determine whether the *position code* corresponding to the multimedia content falls within the start and duration from the start position defined by the particular *navigation object*;

when the *position code* is determined to fall within the start and duration from the start position defined by the particular *navigation object*, *activating the filtering action* assigned to the particular *navigation object*;

playing the multimedia content at the output device in accordance with the *filtering action* of the particular *navigation object*;

providing for displaying a *representation* of the plurality of navigation objects, the *representation* including a description of each of the plurality of *navigation objects*;

providing for receiving a response to the *representation* of the plurality of navigation objects, the response identifying the at least one of the plurality of *navigation objects* to be *disabled*; and

providing for *disabling* the at least one of the plurality of *navigation objects* such that the specific *filtering action* specified by the at least one of the plurality of *navigation objects* is ignored.

**2.** A method as recited in claim **1** wherein the *filtering action* is *skipping* the portion of the multimedia content defined by the particular *navigation object*.[13]

## DISCUSSION

### A.  Claim Construction Principles

Claim construction is the first step in an infringement analysis, and is a matter of law that the court decides.[14] "In construing claims, district courts give claims their ordinary and customary meaning, which is 'the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention.'"[15] "The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation."[16]

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges."[17] However, "[b]ecause the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to" several sources

---

[13] '970 Patent col. 19 l. 47 to col. 20 l. 24 (emphases added).
[14] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976, 979 (Fed. Cir. 1995) (en banc).
[15] *Continental Circuits LLC v. Intel Corp.*, 915 F.3d 788, 796 (Fed. Cir. 2019) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc)). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)).
[16] *Phillips*, 415 F.3d at 1313.
[17] *Id.* at 1314.

4

"'that show what a person of skill in the art would have understood disputed claim language to mean.'"[18] These sources are "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."[19] A district court may "construe the claims in a way that neither party advocates," since the court has an "independent obligation" to construe the claims.[20]

Courts give greater weight to intrinsic evidence—that is, the words of the claims themselves, the specification, and the prosecution history—than to extrinsic evidence—that is, everything else.[21] The language of the claims themselves is typically entitled to the greatest weight, since the specification does not itself define "the right to exclude" and the prosecution history may not be used to "'enlarge, diminish, or vary' the limitations in the claims."[22] Generally, "limitations from the specification may not be read into the claims."[23] Indeed, the Federal Circuit has "cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification."[24] That being said, the Federal Circuit has also

---

[18] *Id.* (quoting *Innova/Pure Water, inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

[19] *Id.* (quoting *Innova*, 381 F.3d at 1116).

[20] *Bancorp Servs. L.L.C. v. Sun Life Assur. Co. of Can. (U.S.)*, 687 F.3d 1266, 1274 (Fed. Cir. 2012).

[21] *See Markman*, 52 F.3d at 979–81.

[22] *Id.* at 980 (quoting *Goodyear Dental Vulcanite Co.*, 102 U.S. 222, 227 (1880)); *see Middleton, Inc. v. Minn. Mining & Mfg. Co.*, 311 F.3d 1384, 1387 (Fed. Cir. 2002) ("[T]he most important indicator of [a term's] meaning . . . is its usage and context within the claim itself."); *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 977 (Fed. Cir. 2014) ("In claim construction, this court gives primacy to the language of the claims, followed by the specification. Additionally the prosecution history, while not literally within the patent document, serves as intrinsic evidence for purposes of claim construction.").

[23] *Bell Atlantic Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1270 (Fed. Cir. 2001).

[24] *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1346–47 (Fed. Cir. 2015) (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1328 (Fed. Cir. 2002)).

emphasized that the specification "is [usually] dispositive; it is the single best guide to the meaning of a disputed term."[25]

It is also important to note that the Federal Circuit "ordinarily interpret[s] claims consistently across patents having the same specification."[26] Thus, while this case deals with several patents, because they share a specification, the court will interpret the terms within consistently, absent an overriding canon.

Finally, this is not the first instance in which some of the disputed terms have been construed by a reviewing body. This court construed a handful of the disputed terms in *ClearPlay v. DISH Network, LLC.*[27] Namely, it construed "filtering action," "position code," and "displaying a representation including a description of each of the plurality of navigation objects,"[28] and it discussed navigation objects in ruling on post-trial motions.[29] And several disputed terms have also been construed by the Patent Trial and Appeal Board ("PTAB").[30] The court observes that while both parties argue that this court should adopt the constructions of prior reviewing bodies with regard to certain disputed terms,[31] at the *Markman* hearing both parties noted that this court is not bound by those constructions.[32]

---

[25] *Phillips*, 415 F.3d at 1315 (quoting *Vidtronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).
[26] *In re Katz Interactive Call Processing Pat. Litig.*, 639 F.3d 1303, 1325 (Fed. Cir. 2011).
[27] Judge David Nuffer presiding. *See generally* No. 2:14-cv-00191-DN-CMR, 2019 WL 4015642 (D. Utah Aug. 26, 2019) (claim construction); No. 2:14-cv-00191-DN-CMR, 2023 WL 1424745 (D. Utah Jan. 31, 2023) (summary judgment); No. 2:14-cv-00191-DN-CMR, 2023 WL 3805596 (D. Utah June 2, 2023) (judgment as a matter of law).
[28] *DISH Network*, 2019 WL 4015642, at *1–2.
[29] *DISH Network*, 2023 WL 3805596, at *17–19, 23–24.
[30] *See infra* notes 61, 79, 100, 135, 177–178 and accompanying text.
[31] *E.g.*, ClearPlay Mot. 6; VidAngel Mot. 10.
[32] *See* Markman Hr'g Tr. 8:3–8:10, 31:1–31:9, 61:10–61:14, 64:14–64:22, ECF No. 317.

### B. Construction of ClearPlay's Patents

### 1. "Navigation object"

| Term | VidAngel's Proposed Construction | ClearPlay's Proposed Construction | # of Appearances in Claims[33] |
|---|---|---|---|
| "Navigation Object" | "A single object, file, or data structure comprising information that defines both (1) a portion of multimedia content to filter (by identifying a start position and a stop position) and (2) a filtering action to be taken on the defined portion of multimedia content." | Plain and ordinary meaning (as defined by the terms of the claims themselves). | '263 Claims: 0<br>'383 Claims: 79<br>'784 Claims: 16<br>'970 Claims: 72 |

ClearPlay argues that "no construction is necessary" and asks the court to define "navigation object" according to its plain and ordinary meaning, as defined by the claims themselves.[34] VidAngel argues for the addition of the phrase "a single object, file, or data structure,"[35] based on this court's jury instruction in *ClearPlay v. DISH Network*.[36]

The claims of the '784, '970, and '383 Patents state that "each navigation object defin[es] a portion of the multimedia content that is to be filtered by defining a start position, a stop position, and a specific filtering action to be performed,"[37] or repeat a nearly identical phrase.[38]

---

[33] '383 Patent col. 20 l. 13 to col. 24 l. 58 (claims 1, 3, 4, 6, 7, 8, 9, 11, 12, 14, 15, 16, 18, 19, 20, 22, 23); '784 Patent col. 19 l. 56 to col. 20 l. 59 (claims 1, 2, 3, 5, 6, 7, 8, 9); '970 Patent col. 19 l. 47 to col. 24 l. 63 (claims 1, 2, 3, 5, 6, 9, 13, 16, 17, 20, 21, 23, 24, 27, 28, 33, 34, 37, 41).

[34] ClearPlay Mot. 6–7.

[35] VidAngel Mot. 9–12.

[36] 2023 WL 3805596, at *24 (noting that the jury was instructed that all elements of a navigation object must be contained within a single object, file or data structure).

[37] '784 Patent col. 20 ll. 9–13 (claim 1); '383 Patent col. 20 ll. 28–32 (claim 1); *id.* col. 21 ll. 39–43 (claim 8); *id.* col. 22 ll. 61–65 (claim 16); *id.* col. 24 ll. 5–9 (claim 20).

[38] '970 Patent col. 19 ll. 58–63 (claim 1); *id.* col. 21 ll. 30–35 (claim 16); *id.* col. 22 ll. 9–14 (claim 17); *id.* col. 23 ll. 37–40 (claim 27).

In addition, the abstracts[39] and specifications[40] of each of these patents include this phrase as well.

Turning first to ClearPlay's argument that "no construction is necessary," "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."[41] Such is the case here. The court further notes that while ClearPlay argues that no construction is necessary, it makes equally clear its position that "a navigation object comprises the start position, the stop position, and the filtering action . . . ."[42] The key dispute is over whether more than this is required to construe a "navigation object."

VidAngel argues for the addition of the phrase "a single object, file, or data structure." In *DISH Network*, the court ultimately instructed the jury that the three elements of a navigation object must be contained within a single object, file, or data structure, given that "object" is singular.[43] And to some extent, this limitation is supported by the intrinsic evidence. The claims repeatedly stated that "*each* navigation object . . . defin[es] a start position, a stop position, and a specific filtering action to be performed."[44] ClearPlay argues that the intrinsic evidence does not support this limitation, and emphasizes that the specifications note that [t]here is no particular limitation on the format of the navigation objects."[45] But like the court in *DISH Network*, the

---

[39] '383 Patent abstract; '970 Patent abstract; '784 Patent abstract.
[40] '970 Patent col. 4 ll. 49–52; *id.* 11 ll. 63–66 (describing Fig. 3A); '784 Patent col. 4 ll. 50–53; *id.* col. 12 ll. 4–7 (describing Fig. 3A); '383 Patent col. 4 ll. 46–49; *id.* col. 12 ll. 10–12 (describing Fig. 3A).
[41] *O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).
[42] ClearPlay Mot. 7.
[43] 2023 WL 1424745, at *5; 2023 WL 3805596, at *24.
[44] *See supra* note 37–38.
[45] ClearPlay R 4–5; *see also* '970 Patent col. 4 ll. 52–56; '784 Patent col. 4 ll. 53–57; '383 Patent col. 4 ll. 49–54.

court here is persuaded that the words of the claims themselves support this limitation: object is singular and the word "each" suggests that every single navigation object must contain those three elements. However, there is no intrinsic support for the addition of the words "file, or data structure"[46]; therefore, the court declines to include them in its construction.

Thus, "navigation object" means: "A single object that defines its own start position, stop position, and filtering action."

### 2. "Filtering action"

| Term | VidAngel's Proposed Construction | ClearPlay's Proposed Construction | # of Appearances in Claims[47] |
|------|----------------------------------|-----------------------------------|--------------------------------|
| "Filtering Action" | "An operation that edits or rejects some multimedia content, for example by skipping, muting, or reframing it." | "An action that edits or rejects some multimedia content while allowing other multimedia content to be unchanged." | '263 Claims: 5<br>'383 Claims: 25<br>'784 Claims: 6<br>'970 Claims: 22 |

ClearPlay advances a construction for "filtering action" based on this court's construction of that term in *DISH Network*, and argues that this construction is supported by the claims themselves, the context of the claims, and the specifications and abstracts.[48] Indeed, in *DISH Network*, the court construed "filtering action" as "[a]n action that edits or rejects some multimedia content while allowing other multimedia content to be unchanged."[49] VidAngel argues that its construction is superior since it does not conflict with prior art, avoids confusion through the inclusion of examples, and avoids re-use of the word "action."[50]

---

[46] *See* Markman Hr'g Tr. 20:14–21:12.
[47] '263 Patent col. 13 l. 51 to col. 15 l. 12 (claims 1, 2, 3, 4, 15); '383 Patent col. 20 l. 13 to col. 24 l. 58 (claims 1, 3, 4, 7, 8, 9, 11, 12, 15, 16, 18, 19, 20, 22, 23); '784 Patent col. 19 l. 56 to col. 20 l. 59 (claims 1, 3, 5, 6, 9); '970 Patent col. 19 l. 47 to col. 24 l. 63 (claims 1, 2, 3, 6, 16, 17, 20, 21, 27, 28, 29, 34).
[48] ClearPlay Mot. 15–17.
[49] 2019 WL 4015642, at *1.
[50] VidAngel Mot. 18–20.

The claims themselves do not define the term "filtering action" and simply refer to examples of filtering actions: a skip, a reframe, and a mute.[51] These specific types of filtering actions operate differently, as made clear by the specifications to the '383, '784, and '970 Patents. A mute for instance, is executed by suppressing the audio to the multimedia while the multimedia is decoded.[52] By contrast, a skip action takes place by discontinuing decoding before objectionable content and then immediately resuming decoding after the objectionable content has ceased.[53] Finally, a reframe takes place by enlarging and repositioning the field of view in order to omit objectionable content.[54] And while nowhere in the disputed patents does the phrase "edit or reject some multimedia content" appear, given that the processes described in the specifications for executing specified filtering actions themselves imply editing or rejecting portions of multimedia content (as those terms are ordinarily used),[55] and given that the parties agree that the construction should include this language, the court will adopt that portion of the parties' proposed constructions.

Turning to specific arguments raised by the parties, VidAngel argues that the word "operation" should be used in place of the word "action," given that the disputed patents deal with computer systems and "action" is duplicative.[56] But "operation" is not used intrinsically to describe filtering actions. Instead, the specification to several disputed patents mention other

---

[51] '970 Patent col. 20 ll. 22–45 (claims 2, 3, and 6); *id.* col. 22 ll. 47–65 (claims 20 and 21); *id.* col. 29 l. 59 to col. 24 l. 22 (claims 28, 29, and 34); '784 Patent col. 20 ll. 34–43 (claims 5 and 6); '383 Patent col. 20 l. 66 to col. 21 l. 8 (claims 3 and 4); *id.* col. 22 ll. 17–25 (claims 11 and 12); *id.* col. 23 ll. 33–45 (claims 18 and 19); *id.* col. 24 ll. 47–58 (claims 22 and 23).

[52] *See* '970 Patent col. 5 ll. 21–37; '784 Patent col. 5 ll. 27–43; '383 Patent col. 5 ll. 25–40.

[53] *See* '383 Patent col. 5 ll. 5–24; '784 Patent col. 5 ll. 7–26; '970 Patent col. 5 ll. 1–20.

[54] *See* '970 Patent col. 5 ll. 38–52; '784 Patent col. 5 ll. 44–58; ''383 Patent col. 5 ll. 42–57.

[55] *See, e.g.*, '970 Patent col. 23 ll. 54–58 (suggesting that "to filter" means to "exclude[e] the portion [of the multimedia content from playback] in accordance with the corresponding navigation object").

[56] VidAngel Mot. 20.

"actions," such as the "video action," the "audio action," the "end action," and the "muting action," in addition to the "filtering action."[57] And because aspects of the filtering action may take place via the user's media player itself,[58] "action," per its plain meaning,[59] is appropriate.

Next, ClearPlay argues that the inclusion of examples in the court's construction is unnecessary and could confuse the jury.[60] It also emphasizes that the PTAB rejected the inclusion of examples during *inter partes* review.[61] The Federal Circuit has held that examples provided by patent specifications are a proper source for discerning claim meaning.[62] As noted above, the disputed patents consistently mention only three types of filtering actions: muting, skipping, and reframing.[63] But, to ClearPlay's point, nothing in the patents suggests that these are the only types of filtering actions available.[64] And indeed, some language in the specifications supports that other types of filtering actions are available: "For example, a fade out . . . filtering action may precede a mute filtering action and a fade in . . . filtering action may

---

[57] *See, e.g.*, '970 Patent, col. 17 l. 28 to col. 28 l. 20; '784 Patent col. 17 l. 40 to col. 18 l. 29; '383 Patent col. 17 l. 60 to col. 18 l. 49.

[58] *See infra* Section B.5.

[59] *See Action*, Merriam-Webster, https://www.merriam-webster.com/dictionary/action [https://perma.cc/VW6B-2YUU] (last visited Nov. 22, 2023) ("7.a. [A]n operating mechanism").

[60] ClearPlay Mot. 16–17.

[61] *Id.* at 17. However, PTAB rejected a construction of the verb form of "to filter" that focused on examples of filtering actions rather than on the function of filtering because such a construction was too narrow, given PTAB's duty to provide the broadest reasonable construction. *See CustomPlay, LLC v. ClearPlay, Inc.*, No. 2013-00484, 2013 WL 8595752, at *6 (P.T.A.B. Nov. 26, 2013).

[62] *See, e.g.*, *Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co.*, 878 F.3d 1336, 1342 (Fed. Cir. 2018) (upholding PTAB construction of soybean patent "having a seed oil fatty acid composition comprising a linolenic acid content of about 3% or less" reaching variety of soybeans with 4% linolenic acid when the specification included an example that had a linolenic acid range of 2.3% to 4.1%).

[63] *See supra* notes 51–54 and accompanying text.

[64] *Cf.* '970 Patent col. 6 ll. 11–15 ("[F]iltering actions should be interpreted broadly to encompass all types of actions that may be useful in filtering multimedia content, including incremental filtering actions that are either separate from or combined with other filtering actions."); *see also* '383 Patent, col. 6 ll. 15–20 (same); '784 Patent, col. 6 ll. 17–21 (same).

follow a mute filtering action."[65] Given this court's prior construction in *DISH Network*, the court declines to include the examples in its claim construction.

Finally, VidAngel argues that ClearPlay's addition of the phrase "while allowing other multimedia content to be unchanged" is unnecessarily confusing.[66] According to VidAngel, by filtering any content, the multimedia as a whole is necessarily changed.[67] Of course, a scene that is reframed is necessarily changed by the reframing,[68] but the following scene—to which no filtering action is applied—is unchanged. As the claims and specifications make clear, a single filtering action only acts on a small portion of the multimedia content to be filtered—the portion defined by the navigation object.[69] Therefore, each navigation object necessarily will act upon only some multimedia content, while allowing the remainder to be unaffected. And as this phrase was adopted in *DISH Network*, the court is persuaded to do the same here.

Thus, "filtering action" means: "An action that edits or rejects some multimedia content while allowing other multimedia content to be unchanged."

---

[65] *E.g.*, '970 Patent col. 18 ll. 36–39.
[66] VidAngel Mot. 19–20.
[67] *Id.*
[68] *Cf.* VidAngel Mot. 20.
[69] *See supra* Section B.1.

### 3. "Skip[ping]"

| Term | VidAngel's Proposed Construction | ClearPlay's Proposed Construction | # of Appearances in Claims[70] |
|---|---|---|---|
| "Skip[ping]" | "Discontinuing the decoding process at the start position indicated by a navigation object and resuming the decoding process at the stop position indicated by the navigation object." | Plain and ordinary meaning | '263 Claims: 1<br>'383 Claims: 4<br>'784 Claims: 1<br>'970 Claims: 5 |

VidAngel argues that "skip[ping]" should be construed in accordance with the method of skipping described by the disputed patents.[71] By contrast, ClearPlay argues that VidAngel's construction is unnecessarily restrictive, and that "[t]he term 'skip' or 'skipping' is commonly understood and does not require construction."[72]

The claims show that "skipping" is a type of filtering action.[73] And the '970 Patent describes the process of skipping: "[S]kipping comprises: terminating the decoding of the multimedia content at the start position of the particular navigation object; advancing to the duration from the start position of the particular navigation object; and resuming the decoding of the multimedia content at the duration from the start position of the particular navigation object."[74] Likewise, the specifications describe the process of skipping: "[T]he navigator

---

[70] '263 Patent col. 13 l. 51 to col. 15 l. 12 (claim 3); '383 Patent col. 20 l. 13 to col. 24 l. 58 (claims 3, 11, 18, 22); '784 Patent col. 19 l. 56 to col. 20 l. 59 (claim 5); '970 Patent col. 19 l. 47 to col. 24 l. 63 (claims 2, 5, 20, 28, 33).

[71] VidAngel Mot. 23–24.

[72] ClearPlay Mot. 11.

[73] '383 Patent col. 20 l. 66 to col. 21 l. 3 (claim 3); *id.* col. 22 ll. 18–21 (claim 11); *id.* col. 23 ll. 33–37 (claim 18); *id.* col. 24 ll. 47–50 (claim 22); '784 Patent col. 20 ll. 34–37 (claim 5); '970 Patent col. 20 ll. 22–24 (claim 2); *id.* col. 22 ll. 47–50 (claim 20); *id.* col. 23 ll. 59–61 (claim 28).

[74] '970 Patent col. 20 ll. 30–39; *see also id.* col. 22 ll. 50–57; *id.* col. 24 ll. 9–16.

instructs the decoder to discontinue decoding at the current multimedia position and to resume decoding at the stop position of the navigation object."[75]

VidAngel also argues that in *inter partes* review before the PTAB, ClearPlay disavowed other methods of skipping. "The doctrine of prosecution disclaimer . . . preclude[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution."[76] Prosecution disclaimer attaches where "the alleged disavowing actions or statements made during prosecution [are] both clear and unmistakable."[77] "Such disclaimer can occur through amendment or argument."[78] Here, ClearPlay clearly and unmistakably did so with regard to at least one other method, since it argued before PTAB that the prior art's method of skipping—in which blank frames replaced the original frames—was distinguishable from ClearPlay's method.[79] In these proceedings, ClearPlay emphasized that its skip was essentially instantaneous, whereas prior art's "skip" would simply play blank frames for the duration of the original objectionable content.[80] Thus, ClearPlay did disclaim this other method.

ClearPlay argues that the terms "skip" or "skipping" are "commonly understood" or at least "not uncommon" and, therefore, require no construction.[81] But the question is not whether

---

[75] *E.g.*, '383 Patent col. 5 ll. 5–10; '970 Patent col. 5 ll. 1–13.

[76] *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003); *accord Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359 (Fed. Cir. 2017).

[77] *Aylus Networks*, 856 F.3d at 1359.

[78] *Id.*

[79] *See, e.g.*, Patent Owner's Response under 37 C.F.R. § 42.120 at 26–28, *CustomPlay, LLC v. ClearPlay, Inc.*, No. IPR 2014-00339 (P.T.A.B. Oct. 27, 2014); *id.* at 50 ("In addition to a start position, a stop position and a defined filtering action, the '784 specification requires that a skip also contain the following essential elements: (1) the discontinuing of decoding at the start position, (2) the resumption of decoding at the stop position, and (3) not transferring the portion of the video between the start and the stop position to a video display."); Patent Owner's Response Under 37 C.F.R. § 42.120 at 46, 48, *CustomPlay, LLC v. ClearPlay, Inc.*, No. IPR 2014-00383 (P.T.A.B. Oct. 31, 2014).

[80] Patent Owner's Response under 37 C.F.R. § 42.120 at 26–28, *CustomPlay, LLC v. ClearPlay, Inc.*, No. IPR 2014-00339 (P.T.A.B. Oct. 27, 2014).

[81] ClearPlay Mot. 11; ClearPlay Resp. 13.

people have a general understanding of those terms. Instead, the focus is on what a person of ordinary skill in the art would understand those terms to mean in the patents. Where, as here, the patent explains what the terms mean, proposing instead a "common understanding" is improper.

ClearPlay is also mistaken in its claim differentiation argument. ClearPlay argues that the doctrine of claim differentiation means that the '970 Patent's description of skipping cannot be used with the other claims of '970 or the other patents at issue here.[82] It emphasizes that VidAngel's proposed construction stems from a dependent claim, and that nowhere in the claims or the specifications do the patents suggest that that method of skipping is the only method claimed by ClearPlay.[83] "Under the doctrine of claim differentiation, it is presumed that different words used in different claims result in a difference in meaning and scope for each of the claims."[84] The doctrine "is at its strongest 'where the limitation sought to be "read into" an independent claim already appears in a dependent claim.'"[85] However, it is equally clear that "dependent claims can aid in interpreting the scope of claims from which they depend."[86] In addition, use of the term "comprising" to set off a claim "creates a presumption that the recited elements are only a part of the device [and] that the claim does not exclude additional, unrecited elements."[87]

---

[82] ClearPlay Mot. 12.
[83] *See* Markman Hr'g Tr. 38: 4–14.
[84] *Clearstream Wastewater Sys., Inc. v. Hydro-Action, Inc.*, 206 F.3d 1440, 1447 (Fed. Cir. 2000); *see also Phillips*, 415 F.3d at 1314 ("Differences among claims can also be a useful guide in understanding the meaning of particular claim terms.").
[85] *Seachange Intern., Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368 – 69 (Fed. Cir. 2005) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004)).
[86] *Regents of Univ. of Cal. V. Dakocytomation Cal., Inc.*, 517 F.3d 1364, 1375 (Fed. Cir. 2008) (quoting *N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1577 (Fed. Cir. 1993)).
[87] *Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1358 (Fed. Cir. 2016) (quoting *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001)).

VidAngel's proposed construction stems from claims 5, 20, and 33 of the '970 Patent. It is true that claims 5 and 33 are doubly dependent—each is dependent on another dependent claim claiming the method recited in an independent claim "wherein the filtering action is skipping."[88] If this were all, the court might well agree with ClearPlay. However, claim 20 recites the same description of a method of skipping, but is not doubly dependent. Claim 20 claims a "computer program product as recited in claim **19** wherein the filtering action is skipping" and also outlines the method of skipping claimed.[89] In addition, only one method of skipping is contemplated by the specifications, and that method is substantively identical to the method recited in the dependent claims.[90] Thus, the intrinsic evidence is clear that the word "skip[ping]" has only one meaning, despite the use of dependent claims and the word "comprising."

The court construes "skip[ping]" as defined by the claims themselves. "Skip[ping]" means: "Terminating the decoding of the multimedia content at the start position of the particular navigation object; advancing to the stop position of the particular navigation object; and resuming the decoding of the multimedia content at the stop position of the particular navigation object."

---

[88] *See* '970 Patent col. 20 ll. 30–39; *id.* col. 24 ll. 9–16.
[89] *Id.* col. 22 ll. 47–57.
[90] *See supra* note 75.

### 4. "Filter[ing]" when used as a verb

| Term | VidAngel's Proposed Construction | ClearPlay's Proposed Construction | # of Appearances in Claims[91] |
|---|---|---|---|
| "Filt[er/ing]" when used as a verb | "Edit or reject some multimedia content during decoding." | "An action that may be used to edit or reject multimedia content while allowing other multimedia content to pass unchanged." | '263 Claims: 2 <br> '383 Claims: 20 <br> '784 Claims: 5 <br> '970 Claims: 20 |

VidAngel argues that the intrinsic evidence suggests that filtering takes place during decoding.[92] ClearPlay argues that the claim language itself does not support that filtering occurs only during decoding, and instead proposes a construction without any time limitations, that purportedly "hews closely" to the construction of "filtering" arrived at in *DISH Network*.[93]

When used as a verb in the claims, "filt[er/ing]" always acts upon the noun "multimedia content" or some variation thereof. As explained above, the claims and specifications of the disputed patents contemplate that "to filter" is "to edit" or "to reject."[94] Therefore, at the very least, "to filter" means "to edit or reject some multimedia content."

The parties dispute whether the court should include the phrase "during decoding" in its construction. The phrase "during decoding" follows a form of "to filter" in claims 1 and 14 of the '263 Patent—the only two places that a form of "to filter" is used in the '263 Patent.[95] Likewise,

---

[91] '263 Patent col. 13 l. 51 to col. 15 l. 12 (claims 1, 16); '383 Patent col. 20 l. 13 to col. 24 l. 58 (claims 1, 8, 16, 20); '784 Patent col. 19 l. 55 to col. 20 l. 59 (claim 1); '970 Patent col. 19 l. 47 to col. 24 l. 63 (claims 1, 16, 17, 27).
[92] VidAngel Mot. 16–18.
[93] ClearPlay's Mot. 8.
[94] *See supra* Section B.2.
[95] '263 Patent col. 13 l. 53 to col. 14 l. 6 (claiming "[a] method for downloading at least one media content filter from a remote storage comprising: . . . [A]utomatically identifying and filtering presentation of portions of the multimedia presentation content during decoding of the encoded video data, using the at least one media content filter stored in the memory."); *id.* col. 14 l. 66 to col. 15 l. 3 (claiming "[a] media player comprising . . . the at least one processing unit configured to automatically identify and filter presentation of portions of the multimedia

some variation of "during decoding" appears several times in conjunction with a form of "to filter" in the specifications for the '383, '784, and '970 Patents.[96] For example, the specification to the '970 Patent reads: "[T]he present invention relates to methods, systems, and computer program products for automatically identifying and filtering portions of multimedia content *during the decoding process*."[97] The Federal Circuit has held that "[w]hen a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention."[98] And while a form of "to filter" does not always appear in conjunction with the phrase "during decoding" in either the claims or the specifications language itself,[99] ClearPlay's patents do not describe a process for filtering the multimedia content prior to decoding. Instead, in order to distinguish itself from prior art, in the patent specifications and before PTAB, ClearPlay has argued that its technology does not pre-filter multimedia.[100] And likewise, ClearPlay's patents do not describe a process for filtering the multimedia content after it has been decoded. Therefore, it is clear from the claims, specification, and prosecution history that "to filter" is tied closely to the decoding process.

However, the examples of filtering actions provided in the '383, '784, and '970 specifications[101] make clear that for certain filtering actions decoding would be discontinued to avoid the objectionable content. For instance, the specification to the '970 Patent notes that a

---

presentation content during decoding of the encoded video data, using the at least one media content filter stored in memory.").
[96] *See* '383 Patent col. 1 ll. 7–11; *id.* col. 4 ll. 34–35; *id.* col. 7 ll. 8–11; '784 Patent col. 1 ll. 18–22; *id.* col. 4 ll. 36–39; *id.* col. 7 ll. 11–14; '970 Patent col. 1 ll. 16–20; *id.* col. 4 ll. 36–38; *id.* col. 7 ll. 4–7.
[97] '970 Patent col. 1 ll. 17–20 (emphasis added).
[98] *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007).
[99] *See, e.g.*, '383 Patent col. 20 ll. 41–48.
[100] *See, e.g.*, Patent Owner's Response Under 37 C.F.R. § 42.120 at 12–13, *CustomPlay, LLC v. ClearPlay, Inc*, No. IPR 2013-00484 (P.T.A.B. Feb. 26, 2014) (discussing ClearPlay's process of dynamic filtering); '970 Patent col. 1 l. 20–col. 4 l. 38.
[101] *See* sources cited *supra* notes 52–54.

skip may take place through "the navigator instruct[ing] the decoder to discontinue decoding at the current multimedia position and to resume decoding at the stop position of the navigation object."[102] Thus, the objectionable content "is never decoded and as a result is never transferred to a multimedia output device."[103] To limit "filt[er/ing]" to "during" decoding would produce a nonsensical result, since the decoding process must be stopped to achieve certain filtering actions. Therefore, VidAngel's proposed construction is not quite right; the construction must make clear that filtering occurs generally throughout the process of decoding, not specifically when multimedia content is actually being decoded.

ClearPlay also argues because the specification states that "filtering actions should be interpreted broadly to encompass all types of actions," that a construction including "during decoding" would be incorrect.[104] But this argument confuses type with temporality or location: "all types of actions" suggests breadth in the kinds of action, it does not inform when or where those actions occur.

ClearPlay further urges that the "during the decoding process" language used in its patents was "intended to describe the viewer's experience."[105] No support is provided for this reading, and a person of ordinary skill in the art would not have read the language ClearPlay chose that way. Additionally, no evidence or argument is provided for why viewers would be aware of, much less care about, the decoding process.

Finally, ClearPlay's argument that its construction "hews closely" to the construction adopted by this court in *DISH Network* is incorrect. Judge Nuffer did not construe "filt[er/ing]"

---

[102] '970 Patent, col. 5 ll. 1–13.
[103] *Id.*
[104] ClearPlay Mot. 9.
[105] ClearPlay Resp. 10.

when used as a verb; instead, he construed only "filtering action."[106] Further, in constructing

"filtering action," the court in *DISH Network* expressly rejected the construction advanced by

ClearPlay here.[107]

Thus, the verb forms of "to filter" mean: "To edit or reject some multimedia content

during the decoding process while allowing other multimedia content to be unchanged."

### 5. "Activating the filtering action(s)"

| Term | VidAngel's Proposed Construction | ClearPlay's Proposed Construction | # of Appearances in Claims[108] |
|---|---|---|---|
| "Activating the Filtering Action(s)" | "Sending a command to the consumer system to perform a filtering action at a start position and to discontinue the filtering action at a stop position." | Plain and ordinary meaning (i.e. "playing the multimedia content at the output device in accordance with the filtering action; effectuating the filtering actions"). | '263 Claims: 0 '383 Claims: 5 '784 Claims: 2 '970 Claims: 4 |

VidAngel argues that both the claims and the specifications define by implication

"activating the filtering action."[109] By contrast, ClearPlay argues that VidAngel's construction

unduly limits the term to one method of activation by "requiring that the activating command be

sent to the decoder."[110] Instead, ClearPlay proposes plain and ordinary meaning based on the

language of the claims themselves,[111] or alternatively, simple plain and ordinary meaning.[112]

---

[106] *Cf. DISH Network*, 2019 WL 4015642, *5.
[107] *Id.*
[108] '383 Patent col. 20 l. 13 to col. 24 l. 58 (claims 1, 7, 8, 15, 16, 20); '784 Patent col. 19 l. 55 to col. 20 l. 59 (claims 1, 9); '970 Patent col. 19 l. 47 to col. 24 l. 63 (claims 1, 16, 17, 27).
[109] VidAngel Mot. 13–14.
[110] ClearPlay Mot. 10. ClearPlay also suggests that Judge Nuffer previously construed this term. However, it provides no citation for this point, and nowhere does the *DISH Network* court engage with a construction of the term "activating the filtering action(s)."
[111] *Id.* at 9.
[112] *See* Markman Hr'g Tr. 52:7–52:16 (acknowledging that a person of ordinary skill in the art likely would not need a construction for the word "activating" as used in the patents).

The claims of the '970 Patent suggest that activation of a filtering action occurs only once "the position code is determined to fall [between the start position and stop position] defined by the particular navigation object."[113] The claims of the '784 Patent and the '383 Patent describe different methods of "activating the filtering action." For instance, at times, the consumer system is described as being "adapted to filter the multimedia content by activating the filtering action for each portion of the multimedia content defined by . . . [the] navigation object."[114] But at other times, the navigator is described as "activating the filtering actions."[115] And at still other times, the server system is described as "sending to the consumer system, the filtering action assigned to the navigation object, whereby the consumer system filters the multimedia content by activating the filtering action."[116] Therefore, while there is some support for VidAngel's proposed construction, the claims themselves make clear that VidAngel's construction is too narrow; activating a filtering action does not take place exclusively through the server system sending a command to the consumer system.

Given that the court has already construed "filtering action," the parties' dispute necessarily centers on the word "activating." And while the claims themselves do not use "activating" in a way other than in conjunction with "filtering action," the specifications do. The specifications to the '383, '784, and '970 Patents use some form of "to activate" in conjunction with actions other than filtering actions, such as the "end action."[117] Thus, it is clear that the verb "activating" is not being used idiosyncratically within the patents.

---

[113] '970 Patent col. 20 ll. 4–7 (claim 1).
[114] '784 Patent col. 20 l. 21 (claim 1); *see also* '383 Patent col. 20 ll. 41–42 (claim 1).
[115] '784 Patent col. 20 ll. 57–58 (claim 9); *see also* '383 Patent col. 21 ll. 23–24 (claim 7).
[116] *See, e.g.*, '383 Patent col. 21 ll. 55–58 (claim 8).
[117] *See, e.g.*, '383 Patent col. 18 ll. 54–56; '784 Patent col. 18 ll. 34–36; '970 Patent col. 18 ll. 25–26; *see also* '383 Patent col. 22 ll. 12–14 (claim 9).

VidAngel points to other language in the specifications that support its construction: "Activating the video filtering action sends a command to the decoder to discontinue decoding immediately and resume decoding at [the] stop position."[118] However, the cited language describes a figure, which is plainly one of many exemplary configurations. As the Federal Circuit has repeatedly emphasized, it is improper to import a limitation from the specification into the claims, especially where it appears that the specification is merely providing an example of the invention.[119] Indeed, the specification continues:

> The server system performing a step for filtering multimedia content . . . includes the acts of (i) comparing the updated position code to the navigation object . . . to determine if the updated position code lies within the navigation object, and (ii) *activating or sending* an [sic] filtering action . . . at the proper time.[120]

Thus, the specification regarding the same figure contemplates multiple configurations.

Likewise, ClearPlay's proposed construction is inapposite. While the phrase "playing the multimedia content at the output device in accordance with the filtering action" does appear within the claims of the disputed patents,[121] nothing in the intrinsic evidence suggests that this phrase defines the phrase "activating the filtering actions." Instead, it is clear that "playing the multimedia content at the output device in accordance with the filtering action" is a method

---

[118] VidAngel Resp. 10 (citing '383 Patent col. 15 ll. 34–37; '970 Patent col. 5 ll. 12–14; '784 Patent col. 15 ll. 20–23).

[119] *See Phillips*, 415 F.3d at 1323 ("To avoid importing limitations from the specification into the claims, it is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so. One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case. Much of the time, upon reading the specification in that context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive.").

[120] *See, e.g.* '970 Patent col. 16 ll. 59–64 (emphasis added).

[121] *See, e.g.*, *id.* col. 20 ll. 8–10.

claimed. That phrase, like all other methods claimed, appears in a separate sub-paragraph and follows a semicolon. The court will not adopt it.

The court finds that this is an instance in which a term's plain and ordinary meaning to a lay judge is the same as it would be for a person of ordinary skill in the art. Having already construed filtering action, there is no need to construe the term "activating." A person of ordinary skill in the art would not attach any idiosyncratic meaning to the term, but instead would read it according to its plain and ordinary meaning.

Because a person of ordinary skill in the art would read "activating the filtering action(s)" in accordance with the term's plain and ordinary meaning, the court concludes no construction is necessary.

### 6. "Position code"

| Term | VidAngel's Proposed Construction | ClearPlay's Proposed Construction | # of Appearances in Claims[122] |
|------|----------------------------------|-----------------------------------|---------------------------------|
| "Position code" | "Information that identifies a current position in the multimedia content." | "Information that defines a location in the multimedia content." | '263 Claims: 0 <br> '383 Claims: 15 <br> '784 Claims: 0 <br> '970 Claims: 18 |

The parties' proposed constructions are not so different. While ClearPlay emphasizes the specifications and argues for the construction adopted by the court in *DISH Network*,[123] VidAngel argues that ClearPlay disclaimed that position codes are anything but the "current position of playback."[124]

---

[122] '383 Patent col. 20 l. 13 to col. 24 l. 58 (claims 2, 8, 9, 10, 17, 20, 21); '970 Patent col. 19 l. 47 to col. 24 l. 63 (claims 1, 12, 16, 17, 18, 27, 40).
[123] ClearPlay Mot. 22; ClearPlay Resp. 25
[124] VidAngel Mot. 22.

Both the '383 and '970 claims make clear that "position codes are time codes."[125] Likewise, the '383 Patent describes a method by which the server system "continuously quer[ies] the consumer system for a position code, the position code indicating a position relative to other positions within the multimedia content."[126] In other words, the position code is dynamic and is distinct from set positions within the multimedia content. The claims also repeat that the position code is compared to navigation objects to determine whether a filtering action must be activated.[127] Finally, the '970 Patent suggests that the position code is updated "in association with decoding the multimedia content on the consumer computer system."[128] Thus, the claims themselves suggest that "position code" refers to the current position of playback, which is then compared against navigation objects to determine if a filtering action should be activated.

The specifications also clarify that a position code is tied closely to playback. Namely, the specifications to the '383 and '784 patents read: "The position code is compared against the stop positions defined in each navigation object. When *playback* reaches a portion of the multimedia defined by a particular navigation object, the navigator sends to the consumer system the filtering action assigned to that navigation object."[129] Indeed, for the position code to work as described—i.e. being continuously queried to determine whether to activate a filtering action or resume normal playback—the position code necessarily must be the position of current playback,

---

[125] '383 Patent col. 20 ll. 64–65 (claim 2); *id.* col. 22 ll. 16–17 (claim 10); *id.* col. 23 ll. 30–31 (claim 17); *id.* col. 24 ll. 45–46 (claim 21); '970 Patent col. 21 ll. 4–5 (claim 12); *id.* col. 22 ll. 42–43 (claim 18); *id.* col. 24 ll. 48–49 (claim 40).

[126] '383 Patent col. 21 ll. 45–48 (claim 8); *id.* at col. 24 ll. 15–17 (claim 20).

[127] '383 Patent col. 21 ll. 48–53 (claim 8); *id.* col. 22 ll. 10–12 (claim 9); *id.* col. 24 ll. 18–23 (claim 20); '970 Patent col. 19 l. 66 to col. 20 l. 7 (claim 1); *id.* col. 21 l. 38–47 (claim 16); *id.* col. 22 ll. 17–27; *id.* col. 23 ll. 44–49.

[128] '970 Patent col. 19 ll. 64–65 (claim 1); *id.* col. 21 ll. 36–37 (claim 16); *id.* col. 22 ll. 15–16 (claim 17); *id.* col. 23 ll. 44–45 (claim 27).

[129] '784 Patent col. 4 l. 64 to col. 5 l. 6 (emphasis added); *see* '383 Patent col. 4 ll. 61–66.

since filtering actions are only activated once playback reaches a navigation object. For instance, the specification illustrates the relationship between the position code and activating a specified filtering action, in reference to Figures 4A and 4B:

> After the multimedia content is decoded at block **432** and transferred to the output device at block **434**, the position code is updated at block **436**. **P41** corresponds to the updated position code. Because **P41** is not within the start and stop positions (**491** and **493**), more multimedia content is decoded (**432**), transferred to the output device (**434**), and the position code is updated again (**436**).

> The updated position code is now **P42**. **P42** also marks the beginning of the navigation object portion **490** of the multimedia content defined by the start and stop positions (**491** and **493**) of the navigation. The video filtering action, skip **495** is activating in block **444**.[130]

---

[130] *See, e.g.*, '970 Patent col. 14 ll. 55–64.



FIG. 4A



FIG. 4B

Thus, the specification and the figures confirm that the term "position code" refers to the updated or current position of playback within the multimedia playback.

ClearPlay suggests that because the specifications use the phrase "current position code," the court should not construe "position code" as referring only to the current playback position.[131] While the specifications do note that "[n]avigator software . . . monitors the decoder for the *current* position code of the multimedia as the multimedia content is being decoded,"[132] they do so only once each, and the court will not read this single reference from the specification as enlarging the scope of the claims themselves.

In *DISH Network*, this court adopted the construction proposed by ClearPlay here.[133] There, the court adopted PTAB's construction, reasoning that while the construction was adopted under a broader standard, "[PTAB's] construction of 'position code' gives ordinary and customary meaning as understood by a person of ordinary skill in the art at the time of the

---

[131] ClearPlay Resp. 25.

[132] '970 Patent col. 4 ll. 57–60 (emphasis added); '383 Patent col. 4 ll. 55–58.

[133] *DISH Network*, 2019 WL 4015642, at *6.

invention."[134] However, PTAB was not faced with a question of whether to include "current" in its construction; it was faced with a question of whether to adopt a construction that was limited to DVDs.[135] Therefore, PTAB's decision is unpersuasive in this case. The *DISH Network* court also found that the dynamic nature of position codes was already sufficiently clear, when the term "position code" was read in context, and that adding the word "current" would create unnecessary redundancy. But the court does not now find this reasoning persuasive. The court's previous construction—"information that defines a location in the multimedia content"—could refer to *any* position within the multimedia (i.e. a start position or a stop position of a navigation object). And emphasizing that the "position code" is the current playback position does nothing except clarify what is implicit in the claims themselves. If the court's construction creates some redundancy, it is a redundancy that serves only to clarify the claims.

Consistent with the claims themselves, "position code" means: "Information that indicates a position relative to other positions within the multimedia content, that position being the current playback position."

---

[134] *Id.*
[135] *See CustomPlay,* 2013 WL 8595752, *8.

28

### 7.   "Consumer [Computer] System"

| Term | VidAngel's Proposed Construction | ClearPlay's Proposed Construction | # of Appearances in Claims[136] |
|---|---|---|---|
| "Consumer System" | Plain and ordinary meaning (as defined by dictionaries), but with a distinct meaning from "server system" | "A system comprising one or more computing devices, including an output device, and associated software." | '263 Claims: 0<br>'383 Claims: 56<br>'784 Claims: 13<br>'970 Claims: 20 |

ClearPlay argues that its construction is in accord with the claims themselves, the specifications, and the figures.[137] By contrast, VidAngel argues that "the term 'consumer' has a plain and ordinary meaning and that meaning modifies '[computer] system,'" that the specifications use the standalone term "consumer" repeatedly in a way consistent with dictionary definitions, and that ClearPlay's construction reads "consumer" out of the term "consumer system."[138]

The claims themselves repeat that "the consumer [computer] system includes a processor, a memory, a decoder, and an output device for playing multimedia content."[139] The claims to the '970 Patent further outline two configurations of a "consumer [computer] system." For instance, it may comprise "one of (i) components of a personal computer, (ii) components of [a] television system, and (iii) components of an audio system."[140] Likewise, it may be a DVD player.[141]

---

[136] '383 Patent col. 20 l. 13 to col. 24 l. 58 (claims 1, 5, 7, 8, 9, 13, 15, 16, 20); '784 Patent col. 19 l. 55 to col. 20 l. 59 (claims 1, 3, 7, 9); '970 Patent col. 19 l. 47 to col. 24 l. 63 (claims 1, 8, 9, 15, 16, 17, 24, 25, 26, 27, 36, 37, 43).
[137] ClearPlay Mot. 18–21.
[138] VidAngel Mot. at 5–7.
[139] '383 Patent col. 20 ll. 16–18 (claim 1); id. col. 21 ll. 26–28 (claim 8); id. col. 22 ll. 44–46 (claim 16); id. col. 23 ll. 47–49 (claim 29); '784 Patent col. 19 ll. 57–59 (claim 1); '970 Patent col. 19 ll. 50–52 (claim 1); id. col. 21 ll. Ll. 23–25 (claim 16); id. col. 21 ll. 64–66 (claim 17); id. col. 23 ll. 31–33 (claim 27).
[140] '970 Patent col. 20 ll. 50–53 (claim 8); id. col. 24 ll. 27–30 (claim 36).
[141] Id. col. 21 ll. 18–19 (claim 15); id. col. 23 ll. 25–27 (claim 26); id. col 24 ll. 62–63 (claim 43).

The specification and figures reinforce this understanding, though with variations depending on the type of system.[142] "FIG. 3A includes navigator **310***a*, content source **330***a*, audio and video decoders **350***a*, and output device **370***a*, all located at consumer system **380***a*."[143]



Figure 3B changes the components somewhat: "FIG 3B includes a content source **330***b*, audio and video decoders **350***b*, and output device **370***b*. In FIG. 3B, however, object store **316***b* is located at server system **390***b*, and all other components are located at consumer system **380***b*."[144]

---

[142] *See* '970 Patent col. 10 ll. 50–60.
[143] *Id.* col. 10 ll. 61–63.
[144] *Id.* col. 12 ll. 25–29.



FIG. 3B

Thus, both the claims and the figures define the components of a consumer system.

Notably, while the specifications state that "[d]ecoding the multimedia content may occur at either the consumer system or the server system,"[145] this does not alter the claims themselves. The Supreme Court and the Federal Circuit are clear that the specification may not expand the claim.[146] Thus, per the claims, a decoder is a necessary component of a consumer system.

The court sees no reason to stray from the definition supplied by the claims themselves, read in light of the specifications. While ClearPlay's proposed construction takes these elements into account,[147] the substitution of "computing device" and "associated software" for "a

---

[145] '383 Patent col. 17 ll. 1–2; '970 Patent col. 16 ll. 44–45; '784 Patent col. 16 ll. 53–54.

[146] *See, e.g.*, *McClain v. Ortmayer*, 141 U.S. 419, 423 (1891) ("The claim is the measure of [the patentee's] right to relief, and, while the specification may be referred to to limit the claim, it can never be made available to expand it."); *Elekta Instruments S.A. v. O.U.R. Sci. Int'l., Inc.*, 214 F.3d 1302, 1308 (Fed. Cir. 2000) ("[T]he unambiguous language of the . . . claim controls over any contradictory language in the written description.").

[147] ClearPlay Mot. 18 ("A processor and a memory are components of a computing device.").

processor, a memory, [and] a decoder" is unnecessarily confusing and is not supported by the intrinsic evidence.

VidAngel argues that the only way to give effect to all claim terms is to give "consumer" its dictionary meaning.[148] And while it is true that courts should give effect to all terms in the claim,[149] there is nothing in the intrinsic evidence to suggest that a person of ordinary skill in the art would understand that a "consumer [computer] system" must belong to a "consumer," as that word is colloquially used. That the specifications use the noun "consumer" in its colloquial sense[150] does not necessarily mean that the word is being used identically in the claims themselves. Instead, a person of ordinary skill in the art would understand that the claims use "consumer [computer] system" to distinguish from the "server system." In other words, the focus of "consumer [computer] system" is on the components of the system itself, not upon who owns the system. Put another way, VidAngel proposes a construction that would transform the adjective "consumer" into the possessive noun "consumer's." That is unsupported.

Based on the claims and the figures, "consumer [computer] system" means: "A system comprising a processor, a memory, a decoder, and an output device for playing multimedia content."

---

[148] VidAngel Mot. 5–7; VidAngel Resp. 2–3.
[149] *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006).
[150] *See, e.g.*, '970 Patent col. 1 ll. 20 to col. 4 ll. 31 (describing the prior art in terms of what was useful and what was not useful to consumers).

### 8. "Decod[e/er/ing]"

| Term | VidAngel's Proposed Construction | ClearPlay's Proposed Construction | # of Appearances in Claims[151] |
|---|---|---|---|
| "Decod[e/er/ing]" | "A device or process for translating multimedia content from the format used to store it on or transmit it to a consumer system to the format for ultimately presenting it at the output device during playback." | "One or more devices or processes for translating multimedia content from a format used for its transmission or storage to a format used for presenting it at an output device." | '263 Claims: 2<br>'383 Claims: 6<br>'784 Claims: 1<br>'970 Claims: 31 |

ClearPlay argues that its construction was adopted in *DISH Network* and is supported by the specifications and figures.[152] VidAngel argues that its construction is also derived from *DISH Network*, that the claim language supports that the "decoder" is part of the consumer system, and that the inclusion of "during playback" is warranted by the claim language.[153]

When used as a verb, the claims repeatedly tie "decod[ing]" to "the multimedia content."[154] In addition, the specifications state: "The decoding process creates various continuous multimedia streams by identifying, selecting, retrieving and transmitting content segments from a number of available segments stored on the content source."[155] And when used as a noun, the claims repeatedly reference the decoder as being part of the consumer system:

---

[151] '263 Patent col. 13 l. 51 to col. 15 l. 12 (claims 1, 14); '383 Patent col. 20 l. 13 to col. 24 l. 58 (claims 1, 8, 16, 20); '784 Patent col. 19 l. 55 to col. 20 l. 59 (claim 1); '970 Patent col. 19 l. 47 to col. 24 l. 63 (claims 1, 5, 7, 10, 16, 17, 20, 22, 23, 27, 33, 35, 38).

[152] ClearPlay Mot. 13–14.

[153] VidAngel Mot. 14–16.

[154] *See* '383 Patent col. 21 l. 44 (claim 8); *id.* col. 24 ll. 13–14 (claim 20); '970 Patent col. 19 ll. 64–65 (claim 1); *id.* col. 20 l. 32 (claim 5); *id.* col. 20 l. 36 (claim 16); *id.* col. 21 ll. 36–37 (claim 16); *id.* col. 22 ll. 15–16 (claim 17); *id.* col. 22 l. 52 (claim 20); *id.* col. 22 l. 56 (claim 20); *id.* col. 23 l. 44–45 (claim 27); *id.* col. 24 l. 11 (claim 33); *id.* col. 24 l. 15 (claim 33); *see also* '263 Patent col. 14 l. 5 (claim 1) ("decoding the encoded video content"); *id.* col. 15 ll. 1–2 (claim 14) (same).

[155] '970 Patent col. 2 ll. 3–6; '784 Patent col. 2 ll. 5–8; '383 Patent col. 1 ll. 63–67.

"[A] consumer system includes a processor, a memory, a decoder, and an output device for playing multimedia content."[156] Thus, it is clear that the noun "decoder" is a device. The specifications clarify:

> The decoder is a translator between the format used to store or transmit the multimedia content and the format used for intermediate processing and ultimately presenting the multimedia content at the output device. . . . Prior to presentation, the multimedia content must be decrypted and/or uncompressed, operations usually performed by the decoder.[157]

Thus, the claims and the specifications adequately define both the noun "decoder" and the verb "to decode." Indeed, in *DISH Network* the court adopted a construction, per the parties' stipulation, that is clearly derived from the specifications: "[The device or process] for translating multimedia content from the format used to store or transmit it to the format for ultimately presenting it at the output device."[158]

VidAngel urges that the court's construction should specify that the decoder is part of the consumer system.[159] But that is not what its proposed construction in fact suggests; instead, its proposed construction suggests that the consumer system is the device that stores or receives transmissions of multimedia content, which is separate from both the decoder and the output device. And, as addressed above, the decoder and the output device are both components of the consumer system.[160]

Next, VidAngel argues that the court should append the prepositional phrase "during playback" to the end of its construction. VidAngel argues that this phrase "makes clear that

---

[156] *See* sources cited *supra* note 139.
[157] '383 Patent col. 2 ll. 6–14; '970 Patent col. 2 ll. 12–20; '784 Patent col. 2 ll. 14–22.
[158] *DISH Network*, 2019 WL 4015642, at *3.
[159] VidAngel Mot. 15.
[160] *See supra* Section B.7.

'presenting [multimedia content] at the output device' occurs during playback."[161] ClearPlay argues that there is no support for this limitation.[162] The specifications make clear that the claimed invention "is directed toward identifying and filtering portions of multimedia content during the decoding process."[163] And, as this court's construction of "to filter" when used as a verb makes clear, the process of filtering takes place during the decoding process.[164] Further, the court's construction of "position code" establishes that the position code refers to the "current playback position."[165] Thus, in a system in which the position code monitors for navigation objects to determine whether to activate a filtering action, where a position code is the current playback position and activating or ignoring a filtering action occurs during decoding, it necessarily must be the case that the decoding process occurs during playback.

Finally, ClearPlay's proposed construction envisions potentially multiple devices or processes performing the media translation rather than a single device or process. ClearPlay does not discuss this proposed alteration from the court's previous construction in *DISH Network*. While the specifications and figures suggest that there may be multiple decoders (for instance, an audio and a video decoder) in each system,[166] they do not suggest that a decoder is itself multiple devices.

The parties have provided no good reason to depart from the court's construction in *DISH Network*, which is amply supported by intrinsic evidence. Thus, "decod[e/er/ing]" means: "A [device or process] for translating multimedia content from the format used to store or transmit it

---

[161] VidAngel Mot. 16.
[162] ClearPlay Resp. 17–18.
[163] *E.g.*, '784 Patent col. 4 ll. 36–38.
[164] *See supra* Section B.4.
[165] *See supra* Section B.6.
[166] *See, e.g.*, '970 Patent figs. 3A, 3B, 3C.

to the format for ultimately presenting it at the output device, all of which occurs during

playback."

### 9. "Disabl[e/ed/ing]"

| Term | VidAngel's Proposed Construction | ClearPlay's Proposed Construction | # of Appearances in Claims[167] |
|------|------|------|------|
| "Disabl[e/ed/ing]" | "Performing an action on the navigation object to disable a specified filtering action so that the filtering action is ignored during playback of multimedia content." | "Causing the filtering action specified by the disabled navigation object to be ignored," per the plain and ordinary meaning as defined by the terms of the claims themselves | '263 Claims: 0<br>'383 Claims: 12<br>'784 Claims: 1<br>'970 Claims: 7 |

ClearPlay argues that "[t]he plain and ordinary meaning of the terms 'disable,' 'disabled,' and 'disabling' is made clear in the language of the claims themselves."[168] VidAngel argues for a construction that makes clear that "'disabling' is an action that must be performed on the navigation object so that its filtering action is ignored" and that disabling occurs during playback.[169]

The claims only use "disabl[e/ed/ing]" in conjunction with navigation objects.[170] For instance, the claims refer to either the server system or consumer system "disabling the at least one of the one or more navigation objects such that the filtering action assigned by the at least one of the one or more navigation objects is ignored."[171] Similarly, the claims refer to "playing

---

[167] '383 Patent col. 20 l. 13 to col. 24 l. 58 (claims 1,8, 16, 20); '784 Patent col. 19 l. 56 to col. 20 l. 59 (claim 3); '970 Patent col. 19 l. 47 to col. 24 l. 63 (claims 1, 17, 27).
[168] ClearPlay Mot. 7.
[169] VidAngel Mot. 20–22.
[170] '383 Patent col. 20 ll. 53–63 (claim 1); *id.* col. 21 l. 65 to col. 22 l. 8 (claim 8); *id.* col. 23 ll. 19–29 (claim 16); *id.* col. 24 ll. 33–44 (claim 20); '784 Patent col. 20 ll. 27–31 (claim 3); '970 Patent col. 20 ll. 15–21 (claim 1); *id.* col. 22 ll. 34–41 (claim 17); *id.* col. 23 ll. 40–42 (claim 27); *id.* col. 23 ll. 54–58 (claim 27).
[171] *See, e.g.,* '383 Patent col. 20 ll. 60–63; '784 Patent col. 20 ll. 28–31; '970 Patent col. 20 ll. 18–21.

the multimedia content at the output device excluding the portion thereof which is filtered in accordance with the corresponding navigation object and ignoring the filtering action specified by any disabled navigation objects."[172] The specifications add some color:

> Navigation objects may be disabled by including an indication within the navigation objects that they should not be part of the filtering process. The act of retrieving navigation objects . . . may ignore navigation objects that have been marked as disabled so they are not retrieved. Alternatively, a separate act could be performed to eliminate disabled navigation objects from being used in filtering multimedia content.[173]

Therefore, the claims and the specifications make clear that "to disable" is intrinsically tied only to navigation objects, and that when disabled, a navigation object's filtering action is ignored.

VidAngel bases its argument that disabling occurs during playback on prosecution history.[174] During a 2013 *inter partes* review focused on the process of disabling navigation objects, ClearPlay argued that the prior art was dissimilar because the prior art created a "video map" prior to playback, rather than using dynamic filtering.[175] And because the "determination [whether to skip or include objectionable segments] is performed during the creation of the video map" it "is therefore irrelevant to the process of employing navigation objects during the process of outputting multimedia content."[176] In other words, the creation of the video map prior to playback was dissimilar to the dynamic use of navigation objects to filter objectionable content, and because of that, selections made during the creation of the video map were dissimilar to the disabling of a navigation object.[177] Indeed, PTAB held that because "the disabling step ignores a

---

[172] '970 Patent col. 23 ll. 54–58.
[173] *E.g.* '970 Patent col. 18 l. 64 to col. 19 l. 4.
[174] *See* VidAngel Mot. 20–22.
[175] Patent Owner's Response Under 37 C.F.R. § 42.120 at 12–13, *CustomPlay, LLC v. ClearPlay, Inc*, No. IPR 2013-00484 (P.T.A.B. Feb. 26, 2014).
[176] *Id.*
[177] *CustomPlay*, 2013 WL 8595752, at *6–7.

specified filtering action during playback, [and] not at some earlier time" ClearPlay's claims were not unpatentable.[178]

From this prosecution history, it is clear that disabled navigation objects are ignored "during playback." However, the process of disabling a navigation object occurs prior to playback.[179] Figure 6 and the specification suggest that disabling is one step in the process of deactivating navigation objects, which necessarily must occur prior to playback.[180]

---

[178] *Id.* at 7.

[179] *See DISH Network*, 2023 WL 3805596, at *18 n.121 (noting that disabling and ignoring are two different actions).

[180] '970 Patent col. 18–19 ("FIG. 6 is a flowchart illustrating a method used in customizing the filtering of multimedia content. At block **610**, a password is received to authorize disabling the navigation objects. A representation of the navigation objects is displayed on or sent to (for server systems) the consumer system in block **620**. Next, as shown in block **630**, a response is received that identifies any navigation objects to disable and, in block **640**, the identified navigation objects are disabled. Navigation objects may be disabled by including an indication within the navigation objects that they should not be part of the filtering process. The act of retrieving navigation objects, as shown in blocks **422** and **522** of FIGS. 4A and 5A, may ignore navigation objects that have been marked as disabled so they are not retrieved. Alternatively, a separate act could be performed to eliminate disabled navigation objects from being used in filtering multimedia content. The acts of receiving a password (**610**), displaying or sending a representation of the navigation objects (**620**), receiving a response identifying navigation objects to disable (**630**), and disabling navigation objects (**640**), have been enclosed in a dashed line to indicate that they are examples of acts that are included within a step for deactivating navigation objects (**660**). As with the exemplary methods previously described, deactivating navigation objects may be practiced in either a consumer system or a server system.").



**FIG. 6**

In addition, the specifications note that "deactivating navigation objects may be practiced in either a consumer system or a server system,"[181] which suggests that deactivating (and therefore disabling) may occur prior to playback.

In addition, VidAngel argues that the court's construction should incorporate Judge Nuffer's discussion in *DISH Network*, which noted that there is a distinction between disabling "a navigation object so that its filtering action is ignored, [and] disabling something other than [a] navigation object that results in the navigation object's filtering action being ignored."[182] Indeed, it is clear from the claims themselves that it is the navigation object itself that is disabled, not something else, and that the disabling of the navigation object results in the assigned filtering

---

[181] '970 Patent col. 19 ll. 11–13.
[182] *DISH Network*, 2023 WL 3805596, at *18.

action being ignored.[183] ClearPlay's proposed construction runs afoul of this limitation. But so too does VidAngel's, which suggests that the filtering action is disabled, not the navigation object.

Thus, "disable[e/ed/ing]" means: "Acting upon a navigation object in such a way that its filtering action is ignored during playback."

### 10. "Representation"

| Term | VidAngel's Proposed Construction | ClearPlay's Proposed Construction | # of Appearances in Claims[184] |
|------|--------------------------------|----------------------------------|-------------------------------|
| "Representation" | "One or more words, symbols, images, or a combination thereof to depict, denote, or delineate the navigation objects, whether individually or in combination, that are displayed on the output device of a consumer system." | "One or more words, symbols, images, or a combination thereof to depict, denote, or delineate navigation objects, whether individually or in combination." | '263 Claims: 0 <br> '383 Claims: 12 <br> '784 Claims: 0 <br> '970 Claims: 6 |

ClearPlay proposes a construction of "representation" that is consistent with this court's construction of the phrase "displaying a representation including a description of each of the plurality of navigation objects" in *DISH Network*.[185] VidAngel argues that the addition of the phrase "that are displayed on the output device of a consumer system" is required by the specifications.[186]

---

[183] *See supra* notes 171–172 and accompanying text.
[184] '383 Patent col. 20 l. 13 to col. 24 l. 58 (claims 1, 8, 16, 20); '970 Patent col. 19 l. 47 to col. 24 l. 63 (claims 1, 17).
[185] ClearPlay Mot. 17.
[186] VidAngel Mot. 23.

The '383 claims describe the server system "sending a representation of one or more navigation objects to the consumer system, the representation including a description of the one or more navigation objects."[187] By contrast, the '970 claims describe a method "providing for displaying a representation of the plurality of navigation objects, the representation including a description of each of the plurality of navigation objects."[188] The specifications clarify that the representation of the navigation objects is part of "a method used in customizing the filtering of multimedia content," as shown in Figure 6.[189]



FIG. 6

In other words, displaying or sending a representation of navigation objects occurs within the process for allowing a consumer to deactivate certain navigation objects.

---

[187] '383 Patent col. 20 ll. 48–51; *id.* col. 21 ll. 61–64; *id.* col. 23 ll. 15–18; *id.* col. 24 ll. 29–32.
[188] '970 Patent col. 20 ll. 11–13; *id.* col. 22 ll. 31–33.
[189] *See, e.g.*, '383 Patent col. 19 ll. 19–24.

This court in *DISH Network* held that "[t]he ordinary and customary meaning of 'representation' in [this] context includes words, symbols, images, or a combination thereof."[190] Therefore, it held that read in the context of ClearPlay's patents, the term "displaying a representation including a description of each of the plurality of navigation objects," meant "[d]isplaying one or more words, symbols, images, or a combination thereof to depict, denote, or delineate the navigation objects, whether individually or in combination."[191] Given the prior construction based on this plain language, that the parties agree on this portion of the construction, and that there is nothing in the intrinsic evidence to suggest otherwise, the court adopts the relevant portions of the prior construction.

VidAngel urges the court to limit "representation" by adding the phrase "that are displayed on the output device of a consumer system" to the end of its construction. But the claims themselves already make clear that the representation of navigation objects is to be either sent to or displayed on the consumer system. And nothing in the intrinsic evidence—and VidAngel cites none—supports that the representation necessarily must be displayed on the output device for the consumer system. Therefore, VidAngel's proposed addition is rejected.

Thus, "representation" means: "One or more words, symbols, images, or a combination thereof to depict, denote, or delineate navigation objects, whether individually or in combination."

---

[190] *DISH Network*, 2019 WL 4015642, at *8.
[191] *Id.*

## ORDER

The disputed terms of the patents are interpreted by the court in this Memorandum Decision and Order. THEREFORE, IT IS ORDERED that:

1. "Navigation object" means: "A single object, file, or data structure that defines its own start position, stop position, and filtering action."

2. "Filtering action" means: "An action that edits or rejects some multimedia content while allowing other multimedia content to be unchanged."

3. "Skip[ping] means: "Terminating the decoding of the multimedia content at the start position of the particular navigation object; advancing to the stop position of the particular navigation object; and resuming the decoding of the multimedia content at the stop position of the particular navigation object."

4. "Filter[ing]," when used as a verb, means: "To edit or reject some multimedia content during the decoding process while allowing other multimedia content to be unchanged."

5. No further construction is necessary for "activating the filtering action(s)."

6. "Position code" means: "Information that indicates a position relative to other positions within the multimedia content, that position being the current playback position."

7. "Consumer [computer] system" means: "A system comprising a processor, a memory, a decoder, and an output device for playing multimedia content."

8. "Decod[e/er/ing]" means: "The [device or process] for translating multimedia content from the format used to store or transmit it to the format for ultimately presenting it at the output device, all of which occurs during playback."

9.  "Disable[e/ed/ing]" means: "Acting upon a navigation object in such a way that its
    filtering action is ignored during playback."

10. "Representation" means: "One or more words, symbols, images, or a combination thereof
    to depict, denote, or delineate navigation objects, whether individually or in
    combination."

Signed April 2, 2024.

BY THE COURT

_____
David Barlow
United States District Judge